ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| LUIS A. MARÍN SOTO<br><br>Recurrido<br><br><br>V.<br><br><br>MUNICIPIO DE SAN JUAN<br><br>Recurrente | TA2025RA00407 | *Revisión judicial* procedente de la Comisión Apelativa del Servicio Público<br><br>Caso Núm.: 2017-06-1281<br><br>Sobre: Retención |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

Marrero Guerrero, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 14 de mayo de 2026.

Comparece el Municipio de San Juan (Municipio o recurrente) y solicita que revisemos una *Resolución* emitida y notificada el 20 de octubre de 2025 por la Comisión Apelativa del Servicio Público (CASP).[1] Mediante dicha determinación, dejó sin efecto la destitución del señor Luis A. Marín Soto (señor Marín Soto o recurrido) y se ordenó la reinstalación en su puesto, la eliminación de la medida disciplinaria de su expediente de personal, así como el pago de los salarios y beneficios marginales dejados de percibir.

Por los fundamentos que se exponen a continuación, se confirma la *Resolución* recurrida.

**I.**

Este caso se originó el 3 de mayo de 2017, cuando el Municipio emitió una *Determinación Final de Proceso Disciplinario* contra el señor Marín Soto, en la que se notificó su destitución como gerente de división en el Departamento de Desarrollo Económico.[2] En esta, consignó que, tras una vista celebrada el 7 de marzo de 2017 ante la

---

[1] Apéndice 2 del caso TA2025RA00407 en el Sistema Unificado de Manejo de Casos (SUMAC) del Tribunal de Apelaciones.
[2] Apéndice 6 en SUMAC TA.

licenciada Anibelle Sloan Altieri, surgió que el 4 de febrero de 2017, durante horas laborables y sin autorización, el recurrido ordenó a un empleado disponer de basura, escombros y materiales, incluido un ataúd, del Cementerio de la Capital en terrenos del Departamento de Obras Públicas y Ornato y que omitió notificar dicha disposición.

El recurrente determinó que tales actos constituyeron crasa negligencia al poner en riesgo la salud y seguridad de terceros. Además, concluyó que incurrió en múltiples infracciones disciplinarias, entre ellas: desempeño negligente o descuidado; incumplimiento de órdenes y reglas de seguridad; poner en peligro la vida y seguridad de empleados u otras personas de forma negligente o deliberada; apropiación, uso o manejo indebido de fondos, bienes o servicios municipales y cualquier otra conducta impropia o contraria a los mejores intereses municipales.

A su vez, el Municipio expresó que el recurrido tenía el deber de supervisar el cumplimiento de los procedimientos del cementerio. Indicó que, previamente, el 22 de julio de 2016, este fue suspendido de empleo y sueldo por treinta (30) días debido al incumplimiento en los procesos de exhumación, inhumación y traslado de cadáveres, medida que no resultó disuasiva, por lo que procedió a su destitución.

A raíz de ello, el 1 de junio de 2017, el señor Marín Soto apeló ante la CASP y alegó que su despido fue injustificado, discriminatorio, arbitrario y caprichoso. Sostuvo que su destitución respondió a represalias políticas y que los hechos esbozados en la carta de despido eran falsos y desproporcionados.

El 1 de agosto de 2017, el Municipio replicó y alegó que el despido del recurrido respondió a violaciones de leyes, reglamentos y normas de conducta en el ejercicio de sus funciones. Manifestó que la sanción de destitución fue proporcional a la gravedad de las faltas, por lo que arguyó que su actuación no fue arbitraria ni caprichosa.

Tras varios incidentes procesales, los días 17 y 18 de julio de 2019, se celebró la vista en su fondo ante el oficial examinador Aniano Rivera Torres, en la que testificaron las señoras Eneida Rodríguez Luna y Yaritza Rosa Pérez, los señores Héctor Rafael Rodríguez Santana, Alexander Ávila Sánchez, Julio Cruz Ramos y el recurrido. En adelante, se procede a sintetizar los testimonios vertidos en la transcripción de la prueba oral (TPO):

**Héctor Rafael Rodríguez Santana**

El testigo declaró que, al momento de los hechos, se desempeñaba como supervisor general de limpieza y ornato en el Municipio y que tenía conocimiento del proceso de recogido de desperdicios.[3] Explicó que los operadores o choferes debían segregar el material vegetativo, el cual no podía mezclarse con escombros, por lo que instruía a sus empleados a recoger únicamente ese tipo de material. Señaló que, al llegar al centro de transbordo, el contenido del camión era inspeccionado por el personal de EC Waste mediante cámaras en el área de pesa y que si el material estaba mezclado no se recibía, pero que si era vegetativo se dirigía al área correspondiente.[4] Aclaró que la determinación final sobre la recepción del material en el centro de transbordo correspondía a EC Waste.[5]

Indicó que, cuando no se aceptaba un cargamento, los empleados lo notificaban a su supervisor y procedía la segregación del material para su disposición. Expresó que no tenía conocimiento personal de los hechos del 4 de febrero de 2017. Explicó que se enteró días después y que el empleado Cristóbal Rosado le informó que un chofer solicitó asistencia con una máquina, a lo cual no accedió. Declaró que, al acudir al lugar, observó un ataúd, material vegetativo

---

[3] TPO vista de 17 de julio de 2019, p. 23.
[4] *Íd.*, p. 28.
[5]

y otros desperdicios. Manifestó que en el centro de transbordo le confirmaron que durante el fin de semana un camión intentó descargar dicho contenido. Expresó que comunicó lo ocurrido a su supervisora, la ingeniera María Burgos, sin rendir informe escrito.[6]

Añadió que, con posterioridad, el señor Marín Soto le solicitó apoyo con una grúa para remover el material, petición que denegó por no ser prioritaria o urgente frente al plan de trabajo de instalar vallas.[7] Precisó que la remoción del material depositado en el área correspondía a su unidad de trabajo y que se realizó ese día.

**Alexander Ávila Sánchez**

El testigo indicó que laboró en el Municipio desde el año 2012 como oficial de cumplimiento ambiental, con la responsabilidad de asegurar que los procesos municipales observaran las regulaciones ambientales federales.[8] Manifestó que carecía de conocimiento directo sobre los hechos en controversia, pero sí los poseía respecto a los procedimientos aplicables a la disposición de ataúdes.[9]

Expuso que dicho proceso se encontraba regulado por la Ley de Servicios Fúnebres y el Reglamento de Salud Pública. Precisó que cada ataúd debía contar con un número de serie del manufacturero, el cual debía constar en los registros del cementerio, junto con el historial completo de su manejo hasta su disposición final. Indicó que la normativa exigía que los ataúdes usados se dispusieran de forma sanitaria, específicamente mediante su entierro. Añadió que el traslado al centro de transbordo formaba parte de ese proceso y que era dicha planta la encargada de realizar el entierro.[10]

Testificó que existía una práctica interna entre la Oficina de Monitoría y Desperdicios Sólidos y EC Waste, en la que se notificaba previamente la disposición de ataúdes y se confirmaba su limpieza.

---

[6] *Íd.* p. 65.
[7] *Íd.* p. 66.
[8] *Íd.* p. 90.
[9] *Íd.* p. 91.
[10] *Íd.* págs. 91-101.

Indicó que dicha práctica no constituía una exigencia reglamentaria ni la realizaban de parte del cementerio, sino la Oficina de Monitoría.

**Julio Cruz Ramos**

El testigo declaró que laboró en el Municipio como operador de equipo pesado por veinticinco (25) años hasta su despido en el 2018.[11] Atestó que, para febrero de 2017, desempeñaba funciones en el cementerio, donde usualmente manejaba la excavadora, aunque en ocasiones trasladaba camiones con desperdicios a EC Waste. Reconoció que conocía que el material vegetativo debía disponerse en Eco Park y no en la pesa del centro de transbordo.

Relató que el sábado, 4 de febrero de 2017, el señor Marín Soto le solicitó transportar unos ganchos al centro de transbordo, tarea que había realizado previamente. Testificó que, al llegar a dicho centro, el operador de EC Waste le negó el acceso y le instruyó que depositara los desperdicios en un solar contiguo destinado a escombros y gomas, pese a haber informado que parte eran cajas porque venía del cementerio. Expresó que acató dicha instrucción del personal de EC Waste por entender que la empresa controlaba las operaciones en el lugar.[12]

Mencionó que, posteriormente, regresó al cementerio e informó al señor Marín Soto que en el centro de transbordo no le permitieron depositar y que lo "mandaron a tirarlo allá a un lado", donde "sacan todo aparte". Indicó que el lunes siguiente, el señor Marín Soto le informó que tenían que acudir al vertedero ante un problema con los desperdicios depositados el sábado y que, con ayuda de un empleado, lograron remover el material. Desconocía el destino final de estos.[13]

Declaró que había visto ganchos (refiriéndose a material vegetativo) y que vio los ataúdes al tirarlos, aunque suponía que

---

[11] *Íd.* págs. 114-115.
[12] *Íd.* págs. 117-118.
[13] Íd. págs. 120-124.

habría ataúdes porque el vehículo que conducía se utilizaba para botar cajas.[14] Declaró que le indicó al encargado que ese no era el lugar pero "Como ellos son los que mandan ahí, pues, me envió y ya."[15]

**Eneida Rodríguez Luna**

La testigo expuso que llevaba quince (15) años en EC Waste y que ocupaba el cargo de directora de operaciones, a cargo del centro de transbordo de San Juan. Señaló que en dichas facilidades se recibían desperdicios domésticos y escombros provenientes del Municipio, la Autoridad de Desperdicios Sólidos y entidades privadas, pero no material vegetativo, conforme al Reglamento Núm. 9 de la Autoridad de Desperdicios Sólidos que requería su segregación y disposición por separado.

Describió que, al arribar un camión, el personal evaluaba e inspeccionaba su contenido mediante cámaras, el cual se recibía si cumplía con los criterios o se rechazaba si era material vegetativo y se orientaba al chofer sobre la necesidad de segregarlo. Aclaró que la empresa no realizaba esa segregación ni su personal tenía la facultad para indicar dónde disponer material no aceptado.

Manifestó que el Municipio solía notificar previamente la disposición de ataúdes mediante correo electrónico o mensajes por la aplicación *WhatsApp* a través de la Oficina de Monitoría o, en ocasiones, de los supervisores, indicando que estos se encontraban limpios. Precisó que no se aceptaban ataúdes con restos o telas y que ello respondía a una práctica, no a una instrucción o exigencia reglamentaria. Puntualizó que, posteriormente, los ataúdes se trasladaban a otras instalaciones para su entierro.

---

[14] *Íd.* págs. 132-134.
[15] *Íd.* págs. 135-136.

**Yaritza Rosa Pérez**

La testigo declaró que, entre febrero y marzo de 2017, tuvo a su cargo la supervisión de los cementerios, incluyendo al señor Marín Soto.[16] Expresó que el administrador del cementerio debía dominar las leyes sobre los procesos de inhumación y exhumación, salud y disposición de materiales, conocimiento que afirmó haber adquirido del señor Marín Soto.[17] Añadió que en el cementerio se realizaban exhumaciones con frecuencia, con un promedio de tres (3) a siete (7) entierros diarios y que la presencia de tantos árboles generaba material vegetativo por las labores frecuentes de corte.

Relató que la ingeniera Noelia Rosa, subadministradora del Municipio y directora interina del Departamento de Desarrollo Económico, la llamó y le informó que se habían depositado materiales del cementerio, incluidas dos cajas, en predios de Obras Públicas y que la ingeniera María Burgos solicitó su remoción inmediata. Indicó que se le requirió notificar al administrador.[18]

Señaló que el señor Marín Soto le expresó que había gestionado el recogido del material y que la disposición se realizó en el lugar habitual, sin comprender por qué no la aceptaron.[19]

En cuanto a las medidas disciplinarias, sostuvo que advino en conocimiento una vez se destituyó al señor Marín Soto.[20] Asimismo, indicó que no se le solicitó inspeccionar el área donde se depositaron los ataúdes ni tenía información sobre el cambio administrativo de los cementerios a Obras Públicas.

**Luis Marín Soto**

El recurrido testificó que se encontraba desempleado y que, previo a ello, ocupaba el puesto de administrador del cementerio

---

[16] TPO, vista de 18 de julio de 2019, p. 34.
[17] *Íd.* págs. 35-36.
[18] *Íd.* p. 37.
[19] *Íd.* p. 40.
[20] *Íd.* págs. 57-58.

desde el año 2010 hasta su destitución en el 2017.[21] Detalló que, entre sus funciones, se encontraba coordinar sepelios y atender a las personas que solicitaban servicios funerarios. Aclaró que el mantenimiento de áreas verdes correspondía a otra división, aunque realizaban podas, dado que la acumulación de hojas en los nichos obstruía los desagües y causaban filtraciones. En cuanto a los ataúdes, indicó que su gestión culminaba al entregarlos en las facilidades de EC Waste, lo que consideraba un procedimiento sanitario, pasando luego la responsabilidad a dicha entidad.

Relató que el sábado, 4 de febrero de 2017, había cuatro (4) sepelios programados. Señaló que, como parte de la preparación habitual, ordenó el corte de un gancho que afectaba el área de nichos. Expuso que, ante la carga del camión, el operador Cruz Ramos le consultó si podía vaciarlo ese día, a lo que accedió, instruyéndole llevarlo al centro de transbordo y continuó con los sepelios. Atestó que cuando el operador regresó, le informó que le instruyeron depositar el material en otro lugar, sin preguntarle la parte exacta, ya que fueron instrucciones provistas por el encargado.[22]

Indicó que el lunes siguiente advirtió la situación al recibir una llamada de su supervisora, quien le comunicó una queja sobre desperdicios en predios de Obras Públicas. Sostuvo que explicó haber dispuesto el material conforme las instrucciones del centro de transbordo.[23] Añadió que le mencionó que se iba a encargar del asunto para resolverlo. Declaró que, acto seguido, acudió al lugar junto al operador Cruz Ramos, donde observó escombros y un ataúd, así como equipos de Obras Públicas. Manifestó que intentó gestionar la remoción del material con un operador, quien inicialmente accedió,

---

[21] *Íd.* págs. 73-74.
[22] *Íd.* págs. 75-77.
[23] *Íd.* págs. 79-80.

pero luego desistió, dado que el señor Héctor Rodríguez Santana y la ingeniera María Burgos no lo autorizaron.

Relató que, tras ello, regresaron al cementerio y el operador volvió al centro de transbordo para recoger los desperdicios, informándole luego que estos habían sido removidos.[24] Indicó que no tuvo conocimiento adicional hasta que fue notificado de una amonestación. Finalmente, sostuvo que confió en la versión del operador Cruz Ramos, quien le aseguró haber seguido instrucciones del personal de EC Waste, por lo que entendió que la disposición del material había sido autorizada por las personas con autoridad.

Concluida la vista y presentados los memorandos de derecho, el caso quedó sometido el 19 de septiembre de 2019 ante la CASP.[25]

Eventualmente, los días 21 de mayo de 2021, 20 de abril de 2023 y 25 de agosto de 2025, el señor Marín Soto presentó mociones informativas y sobre estatus del caso.[26] En estas, señaló que el término dispuesto en el Artículo 8.17 del *Reglamento Procesal de la Comisión Apelativa del Sistema de Administración de Recursos Humanos*, Reglamento Núm. 7313, 6 de marzo de 2007, Departamento de Estado, había vencido sin que la CASP emitiera resolución alguna.

Tiempo después, el 26 de septiembre de 2025, la oficial examinadora Maranyelí Medina Durán rindió su informe, en el que formuló las siguientes determinaciones de hechos, basadas en el expediente y en los testimonios:

1. El PROMOVENTE comenzó a trabajar en el Municipio de San Juan el 21 de marzo de 1991.
2. El 16 de junio de 1991 el PROMOVENTE comenzó a ocupar un puesto de carrera en el MSJ.
3. El 16 de febrero de 2001 el PROMOVENTE fue clasificado de Supervisor de Sección a Gerente de División
4. El MSJ deposita los escombros y la basura doméstica que recoge en el centro de transbordo ubicado en la Ave. Kenne[d]y en San Juan.

---

[24] *Íd.* p. 90.
[25] Apéndices 15 y 16 en SUMAC TA.
[26] Apéndice 17 en SUMAC TA.

5. El centro de transbordo es administrado por la compañía privada EC Waste.
6. El MSJ deposita el material vegetativo que recoge en las instalaciones de Eco Park ubicadas en la Ave. Kenne[d]y en San Juan.
7. El centro de transbordo no acepta material vegetativo.
8. El proceso para depositar escombros y basura doméstica es el siguiente:
   a. El camión llega a las instalaciones de EC Waste.
   b. El camión [s]e coloca en la pesa.
   c. En el área de la pesa se inspecciona el contenido del camión desde un sistema de cámaras que está instalado.
   d. Si en el camión no hay algún material prohibido (material vegetativo) se autoriza que el camión deposite la carga.
9. El proceso para disponer ataúdes es el siguiente:
   a. Se exhuma el cadáver.
   b. Se retiran las telas y los cojines del interior del ataúd.
   c. El ataúd sin el cadáver ni los revestimientos del ataúd se transporta al centro de transbordo.
   d. Del centro de transbordo se trasladan al vertedero donde son enterrados.
10. El 4 de febrero de 2017 el PROMOVENTE ejercía funciones de administrador del Cementerio Municipal.
11. La supervisora inmediata del PROMOVENTE a la fecha del 4 de febrero de 2017 era Yaritza Rosa Pérez.
12. En el Cementerio Municipal en el área de los nichos había un árbol cuyas ramas crecen sobre el techo del edificio de los nichos y al caer las hojas tapan los desagües provocando filtración.
13. En algún momento previo al 4 de febrero de 2017 se cortó la rama de árbol que provocaba la filtración en el edificio de los nichos y se colocó en el camión para su disposición.
14. El 4 de febrero de 2017 en la agenda del cementerio había cuatro (4) sepelios.
15. El 4 de febrero de 2017, fue sábado.
16. El 4 de febrero de 2017 el PROMOVENTE estaba trabajando en el cementerio y le solicitó a Julio Cruz, operador, que llevara el camión que contenía la rama del árbol junto a otros escombros al centro de transbordo administrado por EC Waste.
17. El 4 de febrero de 2017 Julio Cruz condujo el camión con los escombros y las ramas al centro de transbordo de EC Waste.
18. El 4 de febrero de 2017 el operador de EC Waste no le permitió depositar el contenido del camión, sino que lo instruyó a depositarlo en un terreno aledaño.
19. El 4 de febrero de 2017 Julio Cruz depositó el contenido del camión del cementerio en el terreno aledaño a EC Waste donde había otros escombros depositados.
20. El terreno donde se depositó el contenido del camión pertenece al Departamento de Obras Públicas y Ornato que al 4 de febrero de 2017 era dirigido por la ingeniera María Burgos.
21. En el camión proveniente del Cementerio Municipal había un ataúd.
22. El lunes 6 de febrero de 2017 Cristóbal Rosado operador, adscrito al Departamento de Obras Públicas y Ornato se encontraba ubicando unas vallas de cemento en el terreno donde el sábado 4 de febrero de 2017 Julio Cruz había depositado el camión con material del Cementerio Municipal.

23. Las vallas se estaban ubicando para evitar que personas depositaran escombros en el terreno [del] Departamento de Obras Públicas y Ornato.

24. El 6 de febrero de 2017 la señora Noelia Rosado subdirectora de administración se comunicó con Yaritza Pérez para notificarle que, según notificado por la ingeniera María Burgos, en los terrenos del Departamento de Obras Públicas y Ornato había un material, incluido un ataúd, que requerían ser removidos de allí por estar incorrectamente depositado en dicho lugar.

25. El 6 de febrero de 2017, Yaritza Rosa, luego de recibir la información de la ingeniera Noelia Rosa sobre el material en el terreno del Departamento de Obras Públicas y Ornato llamó al PROMOVENTE [y] le requirió que atendiera la situación.

26. El 6 de febrero de 2017 e inmediatamente luego de recibir la llamada de Yaritza Rosado, el PROMOVENTE se dirigió junto a Julio Cruz al área donde se había depositado el material proveniente del Cementerio Municipal.

27. El PROMOVENTE, al llegar al terreno del Departamento de Obras Públicas y Ornato solicitó a Cristóbal que le asistiera con el "loader" para recoger el material del Cementerio Municipal para poder llevarlo al centro de transbordo.

28. Cristóbal Rosado solicitó autorización a su supervisor Héctor Rafael Rodríguez Santana para ejecutar la solicitud del PROMOVENTE. Esta autorización le fue denegada y se le instruyó a proseguir con la instalación de las vallas.

29. El PROMOVENTE se comunicó con Héctor Rafael Rodríguez Santana para conocer porque no podían asistirle con la remoción del material del terreno del Departamento de Obras Públicas y Ornato y este le informó que se debía a que la ingeniera María Burgos no se sentía cómoda con ello.

30. El PROMOVENTE regresó al cementerio y le instruyó a Julio Cruz que regresara a encargarse de recoger el material del Cementerio Municipal para llevarlo al centro de transbordo.

31. Julio Cruz le notificó al PROMOVENTE que el material depositado en el terreno del Departamento de Obras Públicas Municipal había sido recogido.

32. El 3 de mayo de 2017 el PROMOVENTE fue destituido de su puesto de Gerente de División.

Conforme a lo anterior, concluyó que el recurrido no instruyó al operador Cruz Ramos a depositar escombros en terrenos del Departamento de Obras Públicas y Ornato, sino que le indicó trasladarlos al centro de transbordo, lugar donde efectivamente se disponían. Añadió que el recurrente no demostró que el señor Marín Soto ordenó descargar el contenido del camión en un lugar no apto.

De igual manera, señaló que de la prueba desfilada se desprendió que en el centro de transbordo, el personal de EC Waste instruyó al operador Cruz Ramos a depositar el contenido del camión en un terreno aledaño. Consignó que este así lo hizo y vació el camión,

tras lo cual informó al recurrido, quien no se enteró que existía un problema con el lugar de descarga hasta el lunes siguiente.

El 20 de octubre de 2025, la CASP emitió la *Resolución* recurrida, en la que acogió las recomendaciones de la oficial examinadora.[27] En esta, declaró Ha Lugar la apelación del señor Marín Soto y ordenó al Municipio dejar sin efecto su destitución, removerla de su expediente y sustituirla por una suspensión de empleo y sueldo de diez (10) días. Además, ordenó la reinstalación del puesto y el pago de los salarios y beneficios marginales dejados de percibir durante la destitución, con la deducción correspondiente a la suspensión.

Inconforme, el 10 de noviembre de 2025, el recurrente solicitó la reconsideración y sostuvo que el proceso disciplinario cumplió con las garantías mínimas del debido proceso de ley. Arguyó, además, que la destitución estuvo sustentada en prueba sustancial presentada en la vista y contenida en el expediente. Reiteró que la permanencia del recurrido en su puesto habría expuesto al público, al Municipio y a sus empleados a un riesgo indebido. Añadió que el señor Marín Soto había sido previamente disciplinado con una suspensión de treinta (30) días y que la reiteración de conducta justificó la imposición de la destitución, la cual, adujo, quedó acreditada mediante la prueba documental. Sostuvo que la prueba testifical presentada por el Municipio merecía plena credibilidad y que parte de la evidencia presentada por el señor Marín Soto la corroboraba.

No obstante, el 17 de noviembre de 2025, la CASP emitió una *Resolución* en la que denegó la reconsideración.[28]

Insatisfecho, el 17 de diciembre de 2025, el Municipio acudió ante este foro y planteó que la CASP incurrió en los siguientes errores:

> **PRIMER ERROR:** ERRÓ LA CASP EN LA APRECIACIÓN DE LA PRUEBA AL CONCLUIR QUE LA [DESTITUCIÓN] DEL

---

[27] *Íd.*
[28] Apéndice 20 en SUMAC TA.

RECURRIDO NO ESTUVO JUSTIFICADA A PESAR DE QUE EL RECURRIDO [HABÍA] SIDO DISCIPLINADO PREVIAMENTE POR EL MSJ Y EL MSJ HABER DEMOSTRADO LOS HECHOS DEL PRESENTE CASO CON PRUEBA ROBUSTA Y CONVINCENTE.

**SEGUNDO ERROR:** ERRÓ LA CASP, EN DETRIMENTO DEL MSJ Y EN [VIOLACIÓN] DEL DEBIDO PROCESO DE LEY, AL EXCEDERSE Y TARDARSE MÁS DE NOVENTA (90) DÍAS EN EMITIR SU [RESOLUCIÓN] DE 20 DE OCTUBRE DE 2025, LUEGO DE HABERSE CELEBRADO LA VISTA EN SU FONDO ANTE CASP LOS DÍAS 17 Y 18 [DE JULIO] DE 2019, EN [VIOLACIÓN] DE LA ANTERIOR SECCIÓN 3.14 DE LA LEY DE PROCEDIMIENTOS ADMINISTRATIVOS UNIFORME DE PR Y LA SECCIÓN 8.17 DEL ANTERIOR REGLAMENTO PROCESAL NÚM. 7313 DE LA CASP, LOS CUALES ESTABAN VIGENTES AL MOMENTO DE CELEBRARSE LA VISTA EN SU FONDO.

**TERCER ERROR:** ERRÓ LA CASP AL SER EMITIDO EL INFORME DEL OFICIAL EXAMINADOR DE 26 DE SEPTIEMBRE DE 2025 POR UN OFICIAL EXAMINADOR QUE NO TUVO LA OPORTUNIDAD DE VER, [OÍR] Y APRECIAR EL COMPORTAMIENTO DE LOS TESTIGOS DURANTE LA VISTA EN SU FONDO ANTE CASP.

En su escrito principal y en su alegato suplementario del 30 de enero de 2026, el recurrente planteó que la CASP erró en la apreciación de la prueba y que la destitución estuvo sustentada en prueba. Añadió que actuó justificadamente al imponer la medida disciplinaria, conforme al expediente del señor Marín Soto y a la prueba documental y testifical desfilada en la vista.

Asimismo, alegó que la *Resolución* de la CASP debía revisarse, toda vez que se emitió más de seis (6) años desde que se celebró la vista, en contravención al término legal de noventa (90) días para adjudicar el asunto tras la presentación de los memorandos de derecho. Sostuvo que tal dilación resultó injustificada y le ocasionó un perjuicio económico indebido. A su vez, cuestionó la validez del informe de la oficial examinadora y del dictamen de la CASP, al establecer que la funcionaria que suscribió el informe no presidió la vista ni evaluó la credibilidad de los testigos. Ante ello, solicitó que se dejaran sin efectos las determinaciones de hecho y de derecho.

Por su parte, el 30 de enero de 2026 el recurrido presentó su alegato en oposición al recurso, en el que, en esencia, planteó que el recurrente incumplió con su carga probatoria respecto a las

imputaciones en su contra. En particular, señaló que el Municipio no demostró que este ordenó al operador Cruz Ramos disponer del contenido del camión en los predios de Obras Públicas. Además, indicó que tampoco quedó acreditado un incumplimiento con el deber de informar la disposición del material en terrenos adscritos al Departamento de Operaciones y Ornato para alegar que puso en riesgo la salud y seguridad de los empleados y ciudadanos. A su juicio, tales extremos requerían prueba robusta, clara y convincente.

Añadió que el Municipio no planteó que la determinación recurrida era *ultra vires*, arbitraria, caprichosa o irrazonable, ni cuestionó que las determinaciones de hecho descansaron en la prueba documental y testifical. Al respecto, esgrimió que el recurrente no adujo que la oficial examinadora obvió parte de los testimonios.

El recurrido puntualizó que el señalamiento de error relacionado con la demora de la CASP en emitir su determinación carecía de mérito, ya que el Municipio no procuró la resolución del caso ni presentó un recurso de *mandamus*. Señaló que fue él quien, en varias ocasiones, solicitó la adjudicación del asunto, por lo que cualquier perjuicio alegado resultó autoinfligido por el recurrente.

El 9 de abril de 2026, este Tribunal emitió una *Resolución* en la que concedió un término al señor Marín Soto para expresarse sobre el alegato suplementario del Municipio. Transcurrido dicho término sin su comparecencia, el asunto quedó listo para su adjudicación.

## II.

### A. Revisión judicial

La revisión judicial faculta a este Tribunal a examinar las decisiones finales de un foro administrativo con el propósito de asegurar que actuó dentro del marco del poder delegado y conforme a la política legislativa. Art. 4.006(c) de la *Ley de la Judicatura*, Ley Núm. 201-2003, según enmendada, 4 LPRA sec. 24y; Sec. 4.2 de la

*Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, Ley Núm. 38-2017, según enmendada, 3 LPRA sec. 9672 (LPAUG); *OEG v. Martínez Giraud*, 210 DPR 79, 88 (2022); D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 3ra ed., Bogotá, Forum, 2013, pág. 669.

Las determinaciones de hechos de la agencia se sostienen si están apoyadas por la evidencia sustancial en el expediente administrativo. Sec. 4.5 de la LPAUG, *supra,* sec. 9675. En cambio, las conclusiones de derecho y las cuestiones mixtas son revisables en toda su extensión. *Super Asphalt v. AFI y otros*, 206 DPR 803 (2021); *Rivera v. A&C Development Corp.*, 144 DPR 450 (1997).

Los tribunales concedían tradicionalmente deferencia a las interpretaciones jurídicas de los organismos administrativos por razón de su pericia. *Vázquez et al. v. DACo,* 2025 TSPR 56, 216 DPR ___ (2025). No obstante, el Tribunal Supremo de Puerto Rico acogió el criterio de *Loper Bright Enterprises v. Raimondo*, 603 US 369 (2024) y dispuso que corresponde a los foros judiciales ejercer un juicio independiente al revisar la actuación administrativa. *Íd.* Ello, debido a su rol en resguardar la robustez en el sistema jurídico y la confianza pública en los procesos administrativos y judiciales.

### B. CASP[29]

El Plan de Reorganización de la Comisión Apelativa del Servicio Público, Plan de Reorganización Núm. 2-2010, 3 LPRA Ap. XIII, Art. 1, creó la CASP mediante la fusión de la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Servicio Público y la Comisión de Relaciones del Trabajo del Servicio Público. En su virtud, se estableció un foro administrativo con facultades cuasi judiciales especializado en controversias obrero-patronales y de recursos humanos en el servicio público. *Íd.*, Art. 2. Asimismo, se

---

[29] El Reglamento Núm. 9697 de la CASP no es aplicable al caso al entrar en vigor el 19 de octubre de 2025.

dispuso que los reglamentos y documentos administrativos de las agencias fusionadas permanecerían vigentes hasta su modificación o derogación. *Íd.*, Art. 20; Memorando Especial CASP ME-2010-1.

A tales efectos, la Sección 8.17 del Reglamento Núm. 7313, *supra,* dispone lo siguiente en torno al término para emitir resolución:

> Salvo en circunstancias excepcionales, todo caso sometido a un procedimiento adjudicativo ante una agencia deberá ser resuelto dentro de un término de seis (6) meses, desde su radicación. Como norma general una resolución debe ser emitida por escrito dentro de noventa (90) días después de concluida la vista o después de la radicación de las propuestas determinaciones de hechos y conclusiones de derecho, a menos que este término sea renunciado o ampliado con el consentimiento escrito de las partes o por causa justificada.

> Solicitudes de prórroga por justa causa o incumplimientos con las disposiciones de este reglamento o las órdenes dictadas, la complejidad de los asuntos traídos ante el foro, expedientes incompletos, consentimiento de las partes, consolidaciones, causas justificadas, el número de apelantes, atendiendo las circunstancias particulares de cada apelación, escasez de recursos humanos y económicos de la Comisión, serán consideraciones que podrán constituir circunstancias excepcionales o causa justificada para no resolver el procedimiento adjudicativo en los términos directivos de la *Ley de Procedimiento Administrativo Uniforme* dispuestos previamente.[30]

Por otra parte, la Sección 4.6 del Reglamento Núm. 7313, *supra,* establecía que, en casos de suspensión de empleo y sueldo, el peso de la prueba recaía sobre la parte apelada. De otra parte, la Sección 504 del Reglamento Núm. 7766, 29 de octubre de 2009, Departamento de Estado, permitía la designación de un nuevo oficial examinador cuando quien presidió la vista no podía continuar atendiendo el caso antes de rendir su informe, facultándolo a emitirlo a base del expediente y de la grabación o transcripción de la vista. De ello resultar imposible, la Comisión podía adoptar otras medidas. *Íd.*

---

[30] Como norma general, los términos para resolver son directivos, no jurisdiccionales. *Rodríguez v. Alcover*, 78 DPR 822 (1955); *Cf. Bages & Cía., Inc. v. Corte*, 65 DPR 218 (1945); *Tardi v. Tardi*, 30 DPR 225 (1922). Por ello, su incumplimiento no priva de jurisdicción al foro adjudicativo ni acarrea la nulidad del dictamen, aunque las agencias deben observarlos estrictamente. *Íd., Lab Inst. Med. Ava v. Lab. C. Borinquen*, 149 DPR 121 (1999). Su extensión solo procede en circunstancias excepcionales, por consentimiento de las partes o causa justificada. *J. Exam. Tec. Méd. v. Elías et al.*, 144 DPR 483 (1997). Ante su incumplimiento, la parte afectada puede recurrir mediante *mandamus* ante el foro judicial o solicitar la desestimación en la agencia. *Íd., Lab Inst. Med. Ava v. Lab. C. Borinquen, supra.*

De forma análoga, la Regla 64 de Procedimiento Civil, 32 LPRA Ap. V, R. 64, reconoce la sustitución de un juez cuando no puede continuar interviniendo por muerte, enfermedad u otra razón. La regla no obliga a celebrar automáticamente un nuevo juicio, ya que el juez sustituto está facultado para continuar el procedimiento y adjudicar la controversia, siempre que sea de forma justa y adecuada. *Meléndez v. El Vocero,* 189 DPR 123 (2013). El juez sustituto tiene discreción para determinar si continúa con el caso o recibe la prueba testifical, total o parcialmente. La disposición procura evitar demoras y costos innecesarios por la repetición de juicios, sin afectar el derecho a una adjudicación justa e imparcial. *Íd.*

### III.

En este recurso, el Municipio planteó que la CASP erró al concluir que la destitución del señor Marín Soto no estuvo justificada; emitir su dictamen fuera del término de noventa (90) días, y adoptar un informe rendido por una oficial examinadora distinta al que presidió la vista. Tras examinar sosegadamente el expediente del caso en su totalidad, concluimos que no le asiste la razón al recurrente.

En cuanto al primer señalamiento de error, el Municipio alegó que fundamentó la destitución del recurrido mediante prueba robusta y convincente. Al señor Marín Soto se le imputó instruir a un empleado a depositar desperdicios y un ataúd en predios del Departamento de Obras Públicas y Ornato, omitir informar tal acción e incurrir en desempeño negligente, incumplir las normas de seguridad, manejar indebidamente bienes municipales y actuar contrario a los mejores intereses del Municipio. Sin embargo, la prueba desfilada no sostuvo tales infracciones administrativas.

De la TPO surgió que el recurrido, como administrador del cementerio, instruyó al operador Cruz Ramos a llevar el material al centro de transbordo, conforme al curso ordinario de disposición. No obstante, al llegar a dichas facilidades, el personal de EC Waste le

negó el acceso y le indicó que depositara el material en un solar contiguo, instrucción que el operador acató al entender que provenía de la entidad que controlaba las operaciones en el lugar. Al regresar, el operador informó al recurrido que en el centro de transbordo no le permitieron descargar el material y que lo enviaron a depositarlo "a un lado", donde "sacan todo aparte". Por consiguiente, el acto que el Municipio atribuyó al señor Marín Soto —la disposición del material en predios de Obras Públicas y Ornato— no fue consecuencia de una orden suya, sino de una instrucción posterior del personal de la empresa privada que operaba el centro de transbordo.

Además, tampoco se demostró que el recurrido conocía desde el 4 de febrero de 2017 que el material se descargó en un lugar no autorizado ni que deliberadamente omitió notificarlo. Por el contrario, la prueba reflejó que, al enterarse el próximo lunes de la existencia de una situación con la ubicación del material, acudió al lugar con el operador, intentó gestionar la remoción del mismo e instruyó que se recogiera para llevarlo al centro de transbordo. Esa conducta es incompatible con una imputación de negligencia crasa, abandono de deberes o actuación deliberada en perjuicio de la salud y seguridad pública. Por el contrario, evidencia que, al advenir en conocimiento del problema, procuró corregirlo.

Asimismo, no se acreditó apropiación, uso o manejo indebido de fondos, bienes o servicios municipales. La prueba apuntó a una gestión operacional ordinaria relacionada con la disposición de material del cementerio, no a un beneficio personal, desvío de recursos o apropiación de una propiedad municipal. Además, de la prueba desfilada surgió que la disposición de ataúdes en el centro de transbordo formaba parte del procedimiento sanitario correspondiente y que la notificación previa a EC Waste constituía una práctica interna realizada por la Oficina de Monitoría, no una exigencia reglamentaria atribuible al administrador del cementerio.

En consecuencia, el Municipio no probó que el recurrido incumplió una obligación específica de notificación.

Por tanto, coincidimos con la CASP en que la prueba sustancial contenida en el expediente no demostró que el recurrido incurrió en las infracciones disciplinarias imputadas. A lo sumo, reveló una situación operacional provocada por instrucciones impartidas al operador por personal de EC Waste y atendida posteriormente por el señor Marín Soto al advenir en conocimiento de la situación. Lo anterior no sostiene las imputaciones disciplinarias formuladas por el Municipio ni justifica la sanción de destitución. El primer señalamiento de error no se cometió.

Respecto al segundo señalamiento de error, el Municipio sostuvo que la CASP violentó su debido proceso de ley al emitir el dictamen años después de celebrada la vista y sometido el caso. Empero, la demora del foro recurrido no privó de validez su *Resolución.* Si bien la CASP disponía de un término para adjudicar la controversia desde que se radicó el recurso, el mismo era directivo. Ante ello, la parte afectada por la dilación del organismo adjudicativo disponía de mecanismos procesales para compeler la acción administrativa, entre ellos el recurso extraordinario de *mandamus.*

Del expediente surgió que el señor Marín Soto compareció en varias ocasiones para solicitar a la CASP la adjudicación del caso. En contraste, el Municipio no demostró que realizó alguna gestión para que el foro resolviera la controversia. Ante tal omisión, es menester subrayar que una parte que permaneció inactiva durante el trámite administrativo y omitió utilizar los remedios para procurar una adjudicación diligente no puede, posteriormente, invocar la tardanza como fundamento para dejar sin efecto el dictamen.

Asimismo, el Municipio no acreditó un perjuicio concreto, real y sustancial atribuible a la demora administrativa, más allá del impacto económico inherente a la reinstalación. En consecuencia,

aunque este Tribunal reconoce la dilación de la CASP en emitir su *Resolución,* ello no constituye fundamento suficiente para invalidarla. Por tanto, el segundo señalamiento de error tampoco se cometió.

En torno al tercer señalamiento de error, el Municipio planteó que la CASP erró al adoptar un informe suscrito por una oficial examinadora distinta a la que presidió la vista. En específico, sostuvo que la funcionaria que rindió el informe no tuvo la oportunidad de apreciar el comportamiento de los testigos. No obstante, dicho planteamiento tampoco justifica la revocación de la *Resolución* recurrida.

La normativa jurídica aplicable contempla la posibilidad de sustitución de un oficial examinador cuando quien presidió la vista no podía continuar atendiendo el caso antes de rendir su informe. El funcionario sustituto estaba facultado para evaluar el expediente, así como las grabaciones o transcripciones de la vista, y determinar si podía emitir el informe o si resultaba necesario celebrar una nueva vista. Por consiguiente, el mero hecho de que el informe hubiese sido emitido por un oficial examinador distinto no invalidó automáticamente el procedimiento ni requirió, de forma mecánica, la celebración de una nueva vista evidenciaria.

El recurrente no demostró que la oficial examinadora sustituta ignoró parte de la prueba, evaluó incorrectamente la transcripción de la prueba oral o formuló determinaciones carentes de apoyo en el expediente administrativo. Además, este Tribunal examinó cuidadosamente la TPO y concluye que las determinaciones de hecho acogidas por la CASP estaban apoyadas en el expediente. Resolver lo contrario implicaría obligar automáticamente a repetir una vista en su fondo, aun cuando la transcripción de la prueba y el expediente permitían resolver adecuadamente la controversia. Al no demostrarse arbitrariedad, perjuicio, error manifiesto en la apreciación de la prueba o violación al debido proceso de ley, la CASP no incidió al

adoptar el informe rendido por la oficial examinadora sustituta. Por cuanto, el tercer señalamiento de error no se cometió.

En virtud de lo anterior, la determinación recurrida estuvo sustentada en la prueba sustancial que obró en el expediente, por lo que procede su confirmación.

**IV.**

Por los fundamentos que anteceden, se confirma la *Resolución* emitida por la CASP.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones